James Wilson Winger et al., Appellees, v. Chicago City
Bank and Trust Company, etc., et al., Appellants.

Gen. No. 42,987.

460

Heard in the third division of this court for the first district at the February term, 1944. Opinion filed March 21, 1945. Opinion modified and rehearing denied April 11, 1945. Released for publication April 12, 1945.

JOHN S. LEAHY, of St. Louis, Mo., for certain appellants.

POPPENHUSEN, JOHNSTON, THOMPSON & RAYMOND, of Chicago, for cross-appellant; EDWARD R. JOHNSTON, of Chicago, of counsel.

CASSELS, POTTER & BENTLEY, VOGEL & BUNGE, and A. M. FITZGERALD, all of Chicago, for certain appellants; RALPH F. POTTER, LESLIE H. VOGEL and GEORGE C. BUNGE, all of Chicago, of counsel.

VERNON R. LOUCKS and MALCOLM R. MCKERCHAR, both of Chicago, for certain appellees; Charles O. LOUCKS and RICHARD W. PROCTOR, both of Chicago, of counsel.

C. J. BASSLER and WILLIAM S. KLEINMAN, both of Chicago, for certain appellees.

MAXFIELD WEISBROD, of Chicago, for certain other appellee.

MR. JUSTICE LUPE delivered the opinion of the court.

Illinois Bankers Life Association (hereinafter referred to as "association") was organized under the laws

of this State as a mutual assessment life insurance company, in the year 1897. It proceeded to do an insurance business in this State and in other States until the year 1929, when all of its assets were transferred to the Illinois Bankers Life Assurance Company (hereinafter referred to as "company") under the terms of a contract of reinsurance bearing date November 19, 1929.

At the time of the making of the contract of reinsurance, the directors and officers of the association were William H. Woods, J. R. Ebersole, Arthur T. Sawyer, R. M. Work, and Hugh T. Martin. The record discloses that just prior to the making of the contract of reinsurance these directors agreed among themselves that they would organize a legal reserve insurance corporation under the laws of this State; that this new corporation would have a capital of $100,000 to be represented by 1000 shares of stock; that there should be a surplus of $50,000; that 200 shares of stock of the new corporation should be issued to each of said five directors, but that Woods, Ebersole, and Work would each indorse their certificates to Martin, so that upon the conclusion of the stock transaction Martin would hold and own 800 shares of stock and Sawyer 200 shares; that each of the five directors were to assist in every way in the proposed transfer of all the assets of the association to the new legal reserve company under a proposed contract of reinsurance; that in consideration of such assistance by Woods, Ebersole, Work and Sawyer, Woods was to receive from Martin $100,000 in cash before the deal was consummated, and $60,000 in deferred payments to be evidenced by notes signed by Martin and another director of the association; that Woods was to be president of the new company at a salary of $30,000 per annum; that Ebersole was to receive from Martin $25,000 in cash and $75,000 in deferred payments to be evidenced by notes similar to those to be given to Woods; that Work was to receive $75,000 in cash, and Work was to deliver to Martin certain real estate then owned by Work, on

which the association held a mortgage, and Martin was to take care of Work's $15,000 note at the bank; and Sawyer, without the payment of any money by him, was to receive 20 per cent of the stock of the new company to be issued in his name. Pursuant to this scheme, and agreement, on September 13, 1929, the above named officers organized as a legal reserve life insurance company the present assurance company, and a contract of reinsurance was entered into under date of November 19, 1929, between the association and the company. This contract was approved by the director of trade and commerce of the State of Illinois.

After the new company was organized, the same officers and directors of the association elected themselves as officers and directors of the new company; they solicited proxies of the various policyholders of the association for the purpose of voting on the reinsurance contract, and by such solicitation they garnered 15,339 proxies wherein power was given to Martin to vote for and on behalf of such policyholders. At the meeting which was held on the question of whether or not a reinsurance contract should be entered into between the association and the new company, there were 15,401 votes cast, of which Martin cast by proxy 15,339 in favor of the reinsurance contract. At no time, either prior to the receipt of the proxies or thereafter had Martin or the named offices informed any of the policyholders of their scheme to take over the assets of the association by reason of the reinsurance contract, nor did they inform the policyholders of the bribes that were paid by Martin to the other officers or directors of the association.

The contract of reinsurance provided for the transfer to and the assumption by the company of all assets, liabilities, policies, and risks of the association; that all premiums under policies issued by the association were thereafter to be paid to the company; that the

company should have the same right to levy assessments as the association; that all funds of the association should be held by the company as a trust fund for the benefit only of the members of the association; that there should be credited to such trust fund all premiums and assessments paid by continuing members, less a deduction of 25 per cent for the first two years and 22½ per cent thereafter, as a contribution to the expenses of the company, together with interest at from 3½ to 4½ per cent; that that proportion of the surplus earnings of the company accumulated during each year which the total assessment premium income bore to the total renewal premium income of the company should also be credited to such trust fund; that each member of the association so reinsured should have the right to have his certificate or policy converted into any policy issued by the company for that purpose, upon proper adjustment of premiums reserves and without additional medical examination, with certain exceptions; that upon giving 10 days' notice for a meeting at which said contract was approved, of his preference to be transferred to some other corporation than the company, such member or policyholder giving said notice should be accorded all the rights and privileges in and of said transfer as would have been accorded under the terms of the contract had the member or policyholder been transferred to the company as provided by section 16 of the Act with reference to the incorporation of companies to do the business of life or accident insurance on the assessment plan, etc.

The contract further provided that the company assumed and agreed to pay out of the funds of the association so transferred, all of the valid unpaid claims against the association by reason of the death or disability of members occurring prior to the time the contract was to take effect, and all other valid claims against the association; that the company should not

be liable to the individual members or policyholders of the association for any share or portion of the assets of the association; and that the company assumed the liability of the association to pay renewal commissions under all contracts of agency theretofore entered into between said association and its agency managers and agents.

The record discloses that upon the approval and execution of the contract of reinsurance, the association, on the same day (November 19, 1929) executed and delivered to the company (Plf's Exhibit 98) a written assignment of all its assets, moneys, notes, bonds, mortgages, securities, judgments, choses in action, real property, and property of every kind and character wherever situated, belonging to the association.

The capital and paid-in surplus of the company was $150,000. This amount was, on October 10, 1929, borrowed from the Boulevard Bridge Bank on a note signed by Martin and Sawyer who were directors of the association and of the company, and by one John P. Nichol (who acted as an agent for Martin). The total authorized stock of the company, consisting of 1000 shares, was issued in pursuance to the scheme and agreement between all of said directors as hereinabove set forth, 200 shares each to Martin, Woods, Ebersole, Work, and Sawyer. Upon receipt of said stock by Woods, Ebersole and Work, each of them indorsed in blank the certificates issued to them and delivered said certificates to Martin. These certificates, together with the certificates issued to Martin and Sawyer and a certificate of deposit in the sum of $50,000, representing the paid-in surplus of the company, were deposited with said bank as security for the note of $150,000. Prior to the indorsement and delivery of the stock certificates issued by the company to Woods, Ebersole and Work, Martin had carried out his agreement with Woods by giving to him $100,000 in cash and six notes for $10,000 each which were subsequently paid; by

giving to Ebersole $25,000 in cash and three notes for $25,000 each which were also subsequently paid; and $75,000 in cash to Work who at the same time gave Martin a deed to certain real estate in Colorado, in the name of Nichol as his nominee. The record discloses that the cash payments which Martin made to Woods, Ebersole and Work were procured by Martin on August 31, 1929 through a personal loan of $200,000 from James W. Stevens.

In February 1931, the capitalization of the company was increased and $100,000 of additional stock (1000 shares) was issued and paid for by Martin. Of this amount Martin paid $50,000 in cash and the remaining $50,000 was borrowed from the Continental Illinois Bank and Trust Company on the joint notes of Martin, Nichol and Sawyer. Of this additional stock 800 shares were issued to Martin, making a total of 1600 shares then held by Martin and 200 shares were issued to Sawyer, making a total of 400 shares then held by Sawyer. Martin thereafter on October 3, 1941, transferred the 1600 shares to the defendant Chicago City Bank and Trust Company as trustee under a written trust agreement (Plf's Exhibit 204), and it is holding such shares subject to this suit. Of the 400 shares held by Sawyer, 370 shares are now held by the defendant James D. Stice, and 30 shares are held by the defendant George B. Pillsbury as administrator of the estate of Arthur T. Sawyer, deceased.

On January 2, 1930, Nichol, as the secret agent of Martin, entered into a contract with Herbert G. Shimp which provided that Shimp or a company which he intended to organize secure a contract with the assurance company for the transfer and rerating of policyholders of the association; that Shimp would pay Nichol a commission of 25 per cent of the first year's premium on any policies of insurance so transferred or rerated. Shimp thereafter organized the American Conservation Company and on February 28, 1930 the

company entered into a contract with the conservation company to solicit the conversion of policies issued by the association for a commission of 70 per cent of the first year's premiums to be paid on said converted policies. The conservation company continued under this contract and during the years 1930 to 1935, inclusive, received commissions amounting to $1,523,479.54. The conservation company paid Nichol a total sum of $430,000 by 30 different checks dated between July 30, 1930 and June 2, 1932. Nichol turned over the proceeds of all of these checks to Martin.

As a result of Martin's manipulations, he received 1600 shares of stock and a deed to certain real estate in Colorado which the record discloses was worth not more than $40,000; Sawyer received 400 shares of stock of the company for which he paid no consideration; Martin paid to Woods $160,000; to Ebersole $100,000; and to Work $75,000.

There was also paid for the original stock of the company $150,000 and $100,000 for the additional stock issued by the company. The $50,000 note due at the Continental Illinois Bank and Trust Company was paid down to $20,000 by June 2, 1932 and was fully paid on November 2, 1932. The amounts paid thereon as between Martin and Sawyer do not appear. Nichol did not make any payments on this note.

Under the above facts, the plaintiffs, who were members or policyholders of the association, filed this suit to recover on behalf of the association from the estate of Martin the sum of $430,000 received by Martin, with interest thereon; to recover from the estate of Woods the sum of $160,000 received by Woods from Martin, together with interest thereon; and to impose a constructive trust upon the 1600 shares of company stock which had been issued to Martin, held by the Chicago City Bank and Trust Company as trustee and the 400 shares of stock which had been issued to Sawyer, 30 shares of which were held by George B. Pillsbury, ad-

ministrator of the Sawyer estate and 370 shares by James D. Stice. Answers were filed by all of the defendants, and the company, which also filed its counterclaim. This counterclaim alleged substantially the same facts as alleged in the complaint, and, in addition, charged that Martin had perpetrated a number of other frauds upon the company through the sale to it of mortgages on property which was not of sufficient value adequately to secure the loans. The counterclaim requested the entry of a money decree against the administratrix of the Martin estate for $430,000 received by Martin from the American Conservation Company, plus interest thereon; requested the entry of a money decree against the estates of Woods and Martin for the $160,000 paid by Martin to Woods, plus interest thereon; an accounting and money decree with reference to certain loans made from the company at the instance of Martin; and that the Martin estate be required to pay to the company as trustee for the policyholders of the association the amount contributed by said association to the value of the 1600 shares of stock of the company held by Martin in his lifetime by reason of the transfer of the good will and going concern value of said association to the company, and that the court fix and determine the interest which the former policyholders of the association would have in the several money decrees prayed for by the company, and determine what classes of said former policyholders were entitled to an interest in said money decrees, and in what proportions and amounts; and that the court fix and determine the amounts of said money decrees which the company was entitled to hold and receive for its individual benefit.

Subsequently, certain former policyholders of the association who had converted their policies into company policies filed their intervening petition requesting the court to fix and determine the rights of those policyholders of the association who had converted their association policies into company policies.

The cause was heard before the chancellor, who, upon the conclusion of the evidence, entered a decree finding the facts substantially as above set forth. With reference to the 1600 shares of stock issued to Martin and held by the Chicago City Bank and Trust Company as trustee, it was decreed that said stock was held by Martin in constructive trust for the benefit of the association; that Martin's estate had no equitable title or interest therein; and that said stock should be sold for the benefit of the association or its policyholders as of November 19, 1929 equitably entitled to the same. With reference to the 400 shares of company stock issued to Sawyer, it was decreed that Sawyer had received and held said stock in constructive trust for the benefit of the association; that the Sawyer estate held 30 shares and James D. Stice held 370 shares of said 400 shares, in constructive trust for the benefit of the association, and that the same should be sold in the same manner as the Martin stock. Out of the proceeds of the sale of the 400 shares, there should be paid to Stice the sum of $13,079.15. Judgment was entered against Stella R. Woods as executrix of the estate of William H. Woods, deceased, for the sum of $160,000, plus interest, and it was provided that the proceeds of said judgment when received should be held and disposed of as the court should thereafter direct or decree for the benefit of the association or its policyholders as of November 19, 1929, equitably entitled to the same. Judgment was entered against Helen Z. Martin as administratrix of the estate of Hugh T. Martin, deceased, for the sum of $699,078.27, representing the $430,000 received by Martin from the American Conservation Company, plus interest thereon. The company was directed to hold and distribute all sums collected upon said judgment as the court might thereafter direct or decree. The decree further provided that the sale of the 2000 shares of stock was to be made in open court. Charles O. Rundell was appointed trustee and special commissioner to transfer the certif-

icates representing the 2000 shares of stock, to receive and distribute all funds which might be received by him pursuant to the decree, and for other matters in connection therewith. From the entry of this decree the Martin estate, the Martin heirs, the Sawyer estate, and Stice perfected their appeal, and the company has filed cross-errors. The Woods estate did not appeal.

Any relief to be granted to the association or to the company must necessarily be based upon the equitable principle that a fiduciary or trustee can make no profit out of his trust. In the case of *Hooker v. Midland Steel Co.*, 215 Ill. 444, in passing on this question, the court said (p. 451):

"The management of the business and property of a corporation is entrusted to its officers, and they are empowered to act for the whole body of stockholders. They therefore occupy the position of trustees for the stockholders as a body in respect to such business and property, and cannot have or acquire any personal or pecuniary interest in conflict with their duty as such trustees."

Martin, Woods, Ebersole, Work and Sawyer, as directors of the association and as directors of the company, were fiduciaries. As to the association they were trustees of all of the property of the association for the use and benefit of the members of the association and in the case of the company they were in a position of trust with respect to the property of the company.

Being fiduciaries and trustees, they could make no personal profit out of the handling of property of the association or of the company. In *Magruder v. Drury*, 235 U. S. 106, cited with approval in *Ravlin v. Chicago, A. & D. R. Co.*, 297 Ill. 130, there was an objection to an account of trustees because a commission was paid by the trustees for a loan to a firm in which one of the trustees was interested. The court said (pp. 119, 120):

"It is a well settled rule that a trustee can make no profit out of his trust. The rule in such cases springs from his duty to protect the interests of the estate and not to permit his personal interest to in any wise conflict with his duty in that respect. The intention is to provide against any possible selfish interests exercising an influence which can interfere with the faithful discharge of the duty which is owing in a fiduciary capacity. . . . It makes no difference that the estate was not a loser in the transaction or that the commission was no more than the services were reasonably worth. It is the relation of the trustee to the estate which prevents his dealing in such a way as to make a personal profit for himself."

In *Bennett v. Weber,* 323 Ill. 283, the court said (pp. 293, 294):

"Early in the history of this state it was laid down as a general principle of equity that a trustee cannot deal on his own account with the thing or the person falling within the trust. (*Thorp v. McCullum,* 1 Gilm. 614.) A trustee is not permitted to place himself in a position where it will be difficult for him to be honest and faithful to his trust."

As was said in the case of *People ex rel. Barrett v. Central Republic Trust Co.,* 300 Ill. App. 297 (at p. 309):

"The temptation of self interest is too powerful and insinuating to be trusted. Man cannot serve two masters; he will forsake the one and cleave to the other. Between two conflicting interests, it is easy to foresee, and all experience has shown, whose interests will be neglected and sacrificed. The temptation to neglect the interest of those thus confided must be removed by taking away the right to hold, however fair the purchase, or full the consideration paid; for it would be impossible, in many cases, to ferret out the

secret knowledge of facts and advantages of the purchaser, known to the trustee or others acting in the like character. The best and only safe antidote is in the extraction of the sting; by denying the right to hold, the temptation and power to do wrong is destroyed."

Equity courts have long imposed upon fiduciaries and trustees a liability that is beyond the mere equitable right of the beneficiaries. In this class of cases honesty and morality are coextensive with equity. No profit or advantage in the handling of trust property will escape the searching eye of the equity court. It is the dishonest fiduciary who seizes upon an opportunity personally to make a profit through his management of trust property that equity seeks to curb and restrain. It is of no importance if the transaction in question does not result in detriment or a loss to the beneficiary; nor is it of any importance if the transaction results in a benefit or profit to the beneficiaries. The all important fact is that the fiduciary or trustee has received the benefit or advantage through or by the handling of property entrusted to his care and management. The resulting profit or advantage he will not be permitted to retain.

However, in a suit on behalf of beneficiaries against fiduciaries or trustees, the relief to be awarded is not confined to the question of rights and relief of the beneficiaries, for a court of equity must mete out the relief awarded fairly and impartially under all of the facts and circumstances in each particular case. The principle involved is well stated in Pomeroy, Equity Jurisprudence (4th Ed., vol. 1, sec. 388), where the author says:

"It may be regarded as a universal rule governing the court of equity in the administration of its remedies, that whatever may be the nature of the relief sought by the plaintiff, the equitable rights of

the defendant, growing out of or intimately connected with the subject of the controversy in question will be protected; and for this purpose the plaintiff will be required, as a condition to his obtaining the relief which he asks, to acknowledge, admit, provide for, secure or allow whatever equitable rights (if any) the defendant may have, and to that end the court will, by its affirmative decree, award to the defendant whatever reliefs may be necessary in order to protect and enforce those rights. This principle is not confined to any particular kind of equitable rights and remedies, but pervades the entire equity jurisprudence, so far as it is concerned with the administration of equitable remedies.''

Equity courts will protect and enforce any equitable right that a beneficiary or a trustee may have growing out of or intimately connected with the subject matter of the trust. It matters not that the fiduciary may have violated his trust; nor that he has sought to obtain an advantage over the beneficiaries for whose benefit he was handling the subject matter of the trust. Equity will protect the beneficiary to the utmost and divest a fiduciary of any profit or advantage that he has taken or received from the subject matter of the trust and invest the beneficiary with such profit or advantage taken and received by the fiduciary. But equity will not confiscate the property of the fiduciary and deliver it to the beneficiary as a penalty and warning to dishonest fiduciaries. Equity will give unto the beneficiary all that he equitably and honestly is entitled to receive, but if the fiduciary also has equities which the court can fairly and impartially recognize it will protect any such equities to which the fiduciary may be entitled, and this relief, if justified by the facts of any particular case will be in the nature of a condition imposed upon the beneficiary and not in response to any particular prayer or theory advanced by the fiduciary.

█ With the principles as hereinabove set forth we have made an examination of all of the evidence in this case and find no facts which can justify and equitably be held to militate against the conclusion that the directors of the association deliberately, in consideration of Martin's bribes, betrayed the members of the association. In taking the bribes they were unfaithful to their trust. Their concerted action, which is shown from the evidence, in turning over the association and its assets to the company, was collusive in purpose, design and accomplishment. Their actions were prompted and motivated to accomplish the fraudulent design of Martin, and the bribes which they received were in payment for such actions. Martin was the controlling designer in the edifice of fraud, based on bribery and faithlessness to a sacred trust. The bribery agreement, the incorporation of the company, the votes to reinsure; securing of the approval of the reinsurance contract; the false statement that was filed with the commissioner of insurance that no officer or director had received any compensation of any kind or character directly or indirectly in connection with the insurance contract; the borrowing of money by Martin to pay for the stock of the company; the contract with Shimp; the receipt by Martin of the $430,000 of company funds; his repayment of the money he borrowed, from moneys which rightfully belonged to the company or its stockholders, or the money which rightfully belonged to the association or its policyholders; the failure to inform the policyholders of the association of the payment of bribes or the intention of its directors and officers to secure all of the stock of the new company and the assets of the association as well as its goodwill; and all of the other actions that Martin and Sawyer took, were only separate steps in the structure of the fraudulent scheme created and carried out by Martin, assisted by his confederates, Work, Ebersole and Woods, his associate directors and of-

ficers. The actions of Martin and Sawyer were conceived with the fraudulent purpose of withdrawing from the members of the association the business, goodwill and assets of the association with the intended result that Martin and Sawyer would ultimately receive the same assets under a different guise and in a different form.

The association assets, including goodwill, agency contracts and all other intangibles, were as the end result to lie securely within the grasp of Martin and Sawyer. Thus Martin and Sawyer through their fraudulent actions were to obtain the stock of the company which amounted to merely a paper representation of the actual value of the intangibles of the association turned over in the transaction. The court must view all the fraudulent acts of Martin, Sawyer, Ebersole, Work and Woods as a conspiracy in the whole transaction with the purpose of obtaining for Martin and Sawyer all of the capital stock of the company. This is clearly shown from all of the evidence in the case.

The court should be ever ready to lend a willing ear to a plea of justification for a wrongful act committed, to weigh any fact or circumstance which would lend support to a claim of equitable consideration, to overlook, if there be just cause, the mistakes which oftwhiles are committed, but the record here is barren of any favoring fact upon which the court might dwell or to which the court might point as proof that Martin and Sawyer gave consideration to the members of the association who had entrusted their interests to the care and protection of Martin, Sawyer and their confederates. Equity demands that what Martin and Sawyer took and withheld over the years which did not rightfully belong to them, their representatives must now return.

The company stock that Martin and Sawyer obtained stands as the product of their faithless conduct;

the value behind the stock they received was the good-will, agency contracts, and other intangibles which inevitably merged in those certificates of stock. To say that the certificates of stock thus representing the advantage that Martin and Sawyer received can be withheld from the association and its members would be to hold that equity was barred by a mere form, and would be to say that the form of the transaction that Martin and Sawyer used was a cover and a shield for their fraud.

In Bogert (Trusts and Trustees, vol. 3, ch. 24, sec. 484, p. 1520), the author says:

"Obviously if the trustee organizes a corporation to buy at his own sale and is in control of that corporation, the sale to it ought to be treated as a mere subterfuge for a sale to the trustee himself."

Equity will look through this form and will pierce the veil of formality which was inspired by Martin and Sawyer and it will not permit a form created by fraud to be a stumbling block or a bar to the adjustment of equities between the parties. The equities between the parties demand that the 2000 shares of stock received by Martin and Sawyer be held to have been received by them in constructive trust for the use and benefit of the association and its members.

Martin, aside from the dividends received from the stock, paid a total of $195,000 toward the payment of the capital stock of the company. Sawyer paid nothing for the stock held by him except the dividend which he had received on the stock. It therefore follows that Martin or his successor is entitled to receive a credit for $195,000 paid by him toward the payment of such capital stock. He is, however, liable to account to the association for the payments of bribes paid by him to his codirectors and officers in a sum far in excess of $195,000, so that he, Martin, is not entitled to any credit for the $195,000 so paid by him on ac-

count of such stock of the company, and therefore would have no claim against said stock. Sawyer would have no claim against said stock as he paid no consideration whatsoever for the same. We must, however, consider the equities of the other parties whom Martin defrauded in this transaction. To find that Martin while a director of the company received $430,000 of the funds of the company through the medium of the American Conservation Company is to forthwith hold that Martin is liable for that sum to the company, plus interest thereon. (*Farwell v. Pyle-National Elec. Headlight Co.,* 289 Ill. 157; *Dixmoor Golf Club, Inc. v. Evans,* 325 Ill. 612.)

Under the contract of reinsurance the company received an extra year's premium covering the cost of conversion, from those policyholders who converted their assessment policies into legal reserve policies on a date-back basis. It was out of the 70 per cent of these extra year's premiums paid by the company to the American Conservation Company that Martin received the $430,000. Upon receipt of this money Martin became liable to the company (for the benefit of those converting policyholders who paid an extra year's premium) for this sum of money so received by him, but a judgment against the Martin estate for this $430,000 plus interest as determined by the chancellor, which we deem proper, does not necessarily limit the remedy of the company to that judgment. Martin paid into the company on account of the issued stock the sum of $250,000. No part of this $250,000 was the money of the association. The evidence discloses that Martin paid the $150,000 to the Boulevard Bridge Bank and that this amount came from the $430,000 as Martin testified before the Senate investigating committee that:

"Through this kickback arrangement with Mr. Shimp, largely through the Nichol commission, we paid off the organization expense of the company of $150,000."

■ ■ When it appears that a fiduciary has wrongfully obtained money or property of his beneficiary, the beneficiary is entitled to follow the funds received by the fiduciary into whatever property he places the funds, but the funds must be traced so that they can be identified either as the original property of the beneficiary or as a product thereof. (*John B. Colegrove & Co. State Bank v. Gaupp,* 357 Ill. 499.) And it does not matter how many changes in form have been experienced or what the nature of the substitute property was at any given time or now is. (Bogert, Trusts and Trustees, vol. 4, ch. 44, sec. 921, p. 2657.) The company should be permitted to prove upon a further hearing what portion of the difference between $430,000 and $150,000 (for which latter amount we have already held it is entitled to a lien) was used by Martin toward payment for the stock, and the company will be entitled to a lien on said stock for the amount of such portion of such difference it may be able to prove was so used. The liens hereinbefore mentioned to be granted shall be for the benefit of those converting policyholders who paid an extra year's premium. In addition thereto, if the company is able to show that any of the funds of the company other than the $430,000 were used toward payment for the stock held by Martin, it would be entitled to a lien for such additional amount. The amount of the lien or liens can and should be determined by the trial court upon a further hearing.

It is claimed by the various appellants that the trial court had no jurisdiction to sell the stock of the company or to entertain this suit. They admit that the stockholders of a general corporation may properly institute a derivative suit on behalf of the corporation when the directors have an adverse interest or refuse to institute proceedings for the enforcement of a corporate right. But they contend that the action here instituted will interfere with the business of the company

and therefore the trial court had no jurisdiction of the suit.

The question involved is well discussed by the court in the case of *People ex rel. Benefit Ass'n of Railway Employees v. Miner,* 387 Ill. 393, where the court said (p. 397):

"It is clearly announced in *People ex rel. Palmer v. Neihaus,* 356 Ill. 104, 190 N. E. 349, and in *People ex rel. Lowe v. Marquette National Fire Ins. Co.,* 351 Ill. 516, 184 N. E. 800, that the state, not the courts, has authority under its police power for the protection of the public, to supervise the operation of insurance companies."

And the court further stated, at pp. 400 and 401:

"Does the action sought to be brought by Peterson interfere with the business of the relator insurance association? If relief is granted, and the directors and officers, who are charged with wrongful acts, are removed from their offices and declared ineligible to hold such office, such a decree would require the sending out of notices of special election to fill the vacancies and the procurement of other agents to conduct the business. The word 'interfere,' according to the standard lexicographers, means 'to enter into, or to take a part in, the concerns of others; to intermeddle; interpose; intervene.' Nor is a suit of the character involved here similar to the derivative action of a stockholder of a general corporation which is instituted when the directors have an interest adverse to that of the corporation or refuse to cause it to institute such proceedings, as is argued by respondents. Insurance companies, being engaged in a business charged with the public interest, and being the especial objects of the care and supervision of the state, present a different question. *Swan v. Mutual Reserve Fund Life Ass'n,* 155 N. Y. 9, 49 N. E. 258, involving a statute similar to the one under consideration here, was an action by

a policyholder for himself and others, to compel the company to set aside certain sums for a reserve fund and to limit the expenses incident to its management. It was held that the plaintiff did not have legal capacity to maintain the action. It is there pointed out that there is reason for making a distinction between insurance companies and other corporations because the former have characteristics which entitle them to be regarded almost as public in their nature. They are unlike private corporations organized purely for a pecuniary profit. It is also pointed out in that case that in such an action against an insurance company, the plaintiff is not maintaining purely a private action with results which concern only him and the corporation, but is maintaining one which concerns a large body of the public and the continued management of the affairs of a particular class of corporations which have been made the especial objects of care and supervision of the state.''

We fully recognize the principles of law announced by the Supreme Court in that case, and this court is bound by that decision. We consider that the decree to be hereafter entered herein can so establish the liens to be awarded and the distribution of the proceeds of the sale of the stock, so that the provisions of such decree will not be in conflict with that decision. As we hold the company is entitled to a lien in the sum of $150,000 upon the 2000 shares of company stock and for such other and further liens as it may be able to establish and prove, it cannot be reasonably urged that the trial court would not have jurisdiction to establish such lien or liens in favor of the company. In establishing such lien or liens the trial court would not in any manner be interfering with the conduct of the business of the company nor would the court be supervising the operation of the company. It would merely be establishing a legal right in favor of the company for those who were rightfully entitled to

such a lien and which the company could not establish except by resort to the courts. We see no difference in principle in establishing a lien in favor of the company here and foreclosing that lien, than if the company should file proceedings to foreclose a trust deed or mortgage which secured an indebtedness owned by the company.

The court thus having jurisdiction to establish a lien on the 2000 shares of stock in this proceeding, likewise would also have the right to decree that the stock be sold for the benefit of those who are rightfully entitled to the proceeds therefrom. The court likewise would have the right to decree that the stock be sold if payment of the lien or liens were not made, as this action would merely be an enforcement of the liens established by a decree.

The company in its counterclaim has set forth that the proceeds of any recovery of the $430,000 will equitably belong to those policyholders who converted their assessment policies into legal reserve policies on a date-back basis and who paid an extra year's premium covering the cost of conversion, and the company pray for instructions with reference to the method of distributing any such funds recovered. We have held that the company is entitled to a lien on the stock of the company in the manner above set forth and for such other and further lien or liens on the stock as it may be able to prove and establish on a further hearing, but we did not give our views with reference to the manner of distributing any funds received by the company as the proceeds of any recovery of the $430,000 and interest thereon. The moneys thus to be received by the company will not be received by the company in the ordinary course of business, but will be received as a special fund in trust, for the benefit of any policyholders who have converted their assessment policies into legal reserve policies on a date-back basis and who paid an extra

year's premium covering the cost of conversion. The supervision of this particular fund will not amount to a distribution of the company assets and would not interfere with the transactions of its business and, therefore, the trial court would have jurisdiction to direct the manner and method of the distribution by the company, retaining jurisdiction with reference to same. The distribution of moneys due to the association or its policyholders will amount to a distribution of its assets, but this would not have 'the effect of ending or dissolving the corporation. (*Reichwald v. Commercial Hotel Co.*, 106 Ill. 439, 452; *People v. Union Gas & Electric Co.*, 254 Ill. 395, 404; 4 Thompson on Contracts, 3rd Ed., § 2976; *Morris v. Interstate Iron & Steel Co.*, 257 Ill. App. 613, 620.) It is further contended by the appellants that the plaintiffs cannot maintain this suit because no demand was made by plaintiffs upon the director of insurance or upon the last board of directors of the association or the surviving members thereof or upon the new board of directors of the company that action be taken to enforce the alleged rights asserted, nor has it been shown that such demand, if made, would have been unavailing. While recognizing the contention by appellants we do not consider that it is applicable in this case. In the first place, the company in this suit has filed its counter-claim asserting certain rights and interests in the company's stock, and this court is recognizing such rights and interests of the company as above set forth. The trial court, therefore, would have jurisdiction to settle the rights of all claimants to liens upon the stock, irrespective of whether they came into court properly in the first instance. The only requisite would be that the parties be before the court. In the second place, so far as the record shows, there are now no living directors of the association, and at the time of the filing of the complaint the only surviving directors of the association were Woods and Sawyer.

It would have been a useless gesture for the plaintiffs to have made demand upon the directors of the association to bring suit against themselves. (*Babcock v. Farwell*, 245 Ill. 14; *Merle v. Beifeld*, 194 Ill. App. 364.) The record discloses that just prior to the institution of this suit only two of the five directors of the association were living. These two directors were plainly liable for an accounting to the association for the profits they received through the transaction by which the contract of reinsurance was executed and the assets of the association were turned over to the company. These two directors were not functioning as directors of the association and were not carrying on any business for the association and there was no one actively interested in presenting a claim against the deceased directors and those two still living; also these directors were themselves involved in the matter complained of and were liable with reference thereto. Under such conditions it was not necessary that the plaintiffs make a demand upon the surviving directors of the association. Likewise it was not necessary to make a demand upon the former members of the association before this proceeding could be instituted. If the association had been a corporation which had issued stock, as in the case of *United Copper Securities Co. v. Amalgamated Copper Co.*, 244 U. S. 261, it might be necessary to show a demand. In that case, in discussing the necessity for a demand, the court said:

"No application appears to have been made to the stockholders as a body or indeed to any other stockholders individually; nor does it appear that there was no opportunity to make it, and no special facts are shown which render such application unnecessary."

Under the facts in this case it would be almost impossible to obtain a meeting at one time and place of the former policyholders of the association. Under these

486

conditions we are of the opinion that no demand upon the policyholders was necessary before the institution of this suit by the plaintiffs. It is further contended by appellants that this action is barred by the five-year statute of limitations and by laches. Martin occupied a fiduciary relationship to the company and through such relationship could obtain the sum of $430,000 of company money which he should have turned over to the company for the benefit of those who were entitled to the same. The first knowledge that can be imputed to the company was in December 1939, when Martin, Woods, and Sawyer testified before the Temporary National Economic Committee. At that time Martin and Sawyer were still in control of the company and necessarily they would take no action against themselves. Subsequent to the report of the committee and after hearings before the director of insurance of this State with reference to the testimony given before said committee, Martin, on October 3, 1941, transferred to the defendant Chicago City Bank and Trust Company as trustee his 1600 shares of stock in the company for a term of three years. Thereupon, new directors of the company were elected. Following the placing of Martin's stock in trust the new board of directors of the company decided to employ special attorneys to make an investigation with reference to the report and determine if there was any legal liability on the part of anyone connected with the company. This suit was instituted before any action was taken by the company and it filed its counterclaim herein. Under these conditions, neither the statute of limitations nor the doctrine of laches can be invoked in favor of the Martin estate as against the company.

Martin was in a fiduciary relationship to the company and was bound to turn over the sum of $430,000 to the company. He was under a duty to disclose the facts concerning his receipt of this money to the company. (*Vigus v. O'Bannon,* 118 Ill. 334;

*Farwell v. Great Western Tel. Co.,* 161 Ill. 522.) Our courts hold that the failure to use diligence is excused where there is a relation of trust and confidence rendering it the duty of the party committing fraud to disclose the true facts to the person whose trust and confidence has been abused. In such cases the statute of limitations or the beginning of the running of time upon which laches can be predicated only arises when the fraud is discovered. (*Farwell v. Great Western Tel. Co.,* 161 Ill. 522; *Duncan v. Dazey,* 318 Ill. 500; *In re Claim of Crimp v. First Union Trust & Savings Bank,* 352 Ill. 93; *Corcoran v. Waugh,* 368 Ill. 318.) The counterclaim by the company was filed within a reasonable time after the discovery of the fraud perpetrated by Martin, and therefore neither the statute of limitations nor the doctrine of laches can be invoked herein as a bar to the claim of the company.

As to the contention of the Martin and Sawyer estates concerning the claim of the association as asserted through the plaintiffs and interveners, similar principles apply. Martin and Sawyer controlled the association with the other directors and did not divulge to the members of the association their breach of trust with reference to the advantage that they obtained. The members of the association acted within a reasonable time after the breach of trust by Martin and Sawyer was made public through the committee report. Neither the statute of limitations nor the doctrine of laches applied.

It is further contended by appellants that the testimony of Martin, Woods and Sawyer before the Senate investigating committee hearing, was erroneously admitted in evidence and that it was given at an *ex parte* hearing where the witnesses were denied the right of counsel and were not accorded the privilege of cross-examination, nor were they permitted to give any explanation in connection with their testimony. The record discloses that their testimony was

written up and was given to them to examine and make such corrections as they saw fit. Admissions of a party are properly admissible in evidence against him. If admissions are made and were not coerced or made under compulsion, they are admissible in evidence. The testimony of Martin and Sawyer was therefore admissible against them. (*Stump v. Dudley,* 285 Ill. 46; *Van Meter v. Gurney,* 240 Ill. App. 165.) Also, admissions of a decedent are admissible in evidence against the decedent's personal representative who may be prosecuting or defending an action on behalf of decedent's estate. (*Schell v. Weaver,* 225 Ill. 159.) The chancellor committed no error in receiving in evidence the admissions made by Martin, Woods and Sawyer when testifying before the Senate investigating committee.

It is further contended by the Martin estate that the testimony of John P. Nichol by deposition was incompetent and inadmissible. His objection is based on the ground that Nichol was disqualified as a witness under section 2 of the Evidence Act, being a person interested in the outcome of the litigation. Nichol was the holder of a policy of insurance issued by the association and this policy was still in force at the time of the taking of his testimony and at the time of the trial before the chancellor. Nichol had not converted his policy into a policy of the company but still retained the old policy. Under this condition he was a party interested in the outcome of the litigation as he would be entitled to some interest in the moneys to be awarded to the association. In the case of *Cronin v. Supreme Council Royal League,* 199 Ill. 228, the court said, at page 234:

"But the question of the competency of the witness, Ingersoll, remains. If he was interested in the result of the suit it is clear that he was incompetent to testify against the plaintiff, suing as administratrix. The

statute so expressly provides. (Starr & Cur. Stat. chap. 51, sec. 2, p. 1824.) We have held that stockholders in an ordinary corporation are incompetent, on the ground of interest, to testify in an action by or against the corporation (*Albers Commission Co. v. Sessel,* 193 Ill. 153, and cases cited). On the same principle it would seem that a member of a benefit association like this is interested in the result of a suit against the society upon a benefit certificate.''

It is contended by plaintiff and the interveners that this interest of Nichol was offset by the fact that Nichol had a claim for $20,000 against the Martin estate and if the association were awarded all of the stock of the company that Nichol would lose the opportunity of collection of his $20,000 claim, and they reason that the test of interest to disqualify a witness is whether the witness will as a whole gain or lose as a direct result of the suit; that if the weight of his financial interest is against the party by whom he is called as a witness he is not disqualified; and they argue that by reason of his loss of the $20,000 claim against the Martin estate it outweighed his financial interest as a member of the association. They cite *Baker v. Updike,* 155 Ill. 54; *Wetzel v. Firebaugh,* 251 Ill. 190; *Stephens v. Hoffman,* 263 Ill. 197; *Flynn v. Flynn,* 283 Ill. 206 and *Brownlie v. Brownlie,* 351 Ill. 72, which we have carefully read and examined. We have considered the testimony of Nichol with reference to his claim against the Martin estate. He testified that he considered the Martin estate was indebted to him, as he had talked to a number of men in reference thereto and they thought he had a good claim but that he did not know what he was going to do about it. The record fails to disclose the nature of Nichol's alleged claim and there is no proof that this claim has ever been filed or allowed as a claim against the Martin estate, nor that it is an advantageous and

meritorious claim which will necessarily be allowed against the estate. Therefore, the claim of Nichol against the Martin estate is uncertain and indefinite to say the least and under these conditions we cannot hold that any supposed loss of Nichol's claim against the Martin estate will outweigh the interest of Nichol as a policyholder of the association. We therefore hold the cases hereinabove referred to have no application. We are of the opinion that the testimony of John P. Nichol was incompetent against the Martin estate and that the chancellor erred in receiving such evidence against the administratrix of the estate. However, from the evidence with reference to the liability of the Martin estate we are satisfied that the liability of Martin is established in reference thereto without taking into consideration the testimony of Nichol on that point. The exclusion of the testimony of Nichol as to the Martin estate does not affect the determination of the lien on the 1600 shares of stock or the liability of his estate for the sum of $430,000 plus interest or the question of the constructive trust on said 1600 shares of stock as hereinabove set forth. With respect to the testimony of Nichol which tends to establish the claim of the company to the sum of $430,000 received by Martin from the American Conservation Company, we consider that Nichol's testimony was admissible. Nichol was not a stockholder of the company and does not have the slightest financial interest in the recovery of the $430,000 and interest thereon by the company. The policyholders who converted their assessment policies into legal reserve policies on a date-back basis and who paid an extra year's premium covering the cost of conversion, are entitled to receive the proceeds of any recovery on the amount of $430,000. Nichol has no financial interest therein. He was, therefore, not disqualified as a witness to testify in so far as the claim of $430,000 and interest is concerned, and the chancel-

lor properly ruled that his testimony in that regard was admissible. The Sawyer estate is also defending through its personal representative, and this estate and Stice claim that the chancellor erred in receiving in evidence the deposition of Nichol. One of the grounds urged is that Sawyer was not a party to the cause at the time the Nichol deposition was taken. We cannot agree with this contention. The record shows that Sawyer made a motion to dismiss the complaint, the motion was allowed, and time was given within which to file an amendment to the complaint. Such amendment to the complaint was subsequently filed. The order dismissing the complaint and giving leave to the complainant to file an amended complaint was not a final order disposing of the litigation, and Sawyer continued to be a party to the litigation in the absence of such a final order. In the case of *Gibson v. Shearburn,* 301 Ill. App. 629, the plaintiff filed a motion to dismiss in the nature of a demurrer. The court allowed the motion and granted leave to plaintiff to file an amended complaint within 10 days and the plaintiff filed his amended complaint within said 10 days. Thereafter the defendant moved to dismiss the amended complaint on the ground that the court, having previously entered an order sustaining the motion to dismiss, no action was pending between the parties in which plaintiff could file an amended complaint. The court in overruling such contention said:

"The trial court in ruling upon the motion to dismiss the original complaint, grants such motion and by the same order grants the plaintiff ten days within which to file an amended complaint in said cause. An order merely sustaining a demurrer to a complaint, or a motion to dismiss which is in the nature of a demurrer, and upon which no judgment is entered, is not a final adjudication. (Freeman on Judgments (5th ed.) Vol. 2, p. 1512, Par. 717.) This rule is observed in the case of *Trebbin v. Thoeresz,* 316 Ill. 30, 32; *Barber v.*

*Wood,* 318 Ill. 415. Where a motion to dismiss a complaint, which is in the nature of a demurrer, is sustained, for such ruling to become final, a judgment should be entered for the defendant to the effect that the plaintiff take nothing by virtue of such action and that the defendant go hence without day, or words of similar import and meaning. (*Chicago Portrait Co. v. Crayon Co.,* 217 Ill. 200.) This same principle is announced in the cases of *County of Franklin v. Blake,* 257 Ill. 354; *Williams v. Huey,* 263 Ill. 275; and *Prange v. City of Marion,* 297 Ill. App. 353.''

The motion to dismiss which Sawyer made was in the nature of a demurrer and the order entered was not a final order. The cause was still pending as to Sawyer and Sawyer was a party to it at the time the Nichol's deposition was taken. We therefore necessarily feel that this ground of objection to the deposition of Nichol was not well taken. It is contended by the Sawyer estate that the testimony of Nichol was not admissible under section 2 of the Evidence Act because of interest of Nichol in the outcome of the litigation. We have already held that Nichol had no interest in the company and that the testimony of Nichol was admissible against the estate so far as the company was concerned. For this same reason we hold that the testimony of Nichol was admissible against the Sawyer estate and Stice in so far as the company is concerned. With reference to the objection to the testimony of Nichol as to the Martin estate, the deposition of Nichol was read at the trial before the chancellor. If Nichol had appeared as a witness in person before the chancellor, his testimony would have been inadmissible as to the Sawyer estate because of the inhibition of section 2 of the Evidence Act. We feel that section 2 refers to evidence upon the trial of a cause. If a deposition of an interested witness is taken prior to the trial and one of the parties to the

cause dies prior to the deposition being read in evidence, we are of the opinion that in so far as the testimony in the deposition affects the deceased it is inadmissible upon the trial of the cause. The taking of a deposition is not a trial of a cause when offered upon the trial of the cause, it is a substitute for the testimony of the person who made the deposition. The deceased had no opportunity on any trial to contradict the evidence of the person giving the deposition, so that we feel it would be going beyond the intention expressed in section 2 to allow in evidence upon the trial testimony given by way of deposition where the witness is an interested party and one of the parties dies prior to the trial and his personal representative is defending upon the trial of the cause. However, we are of the opinion that the sustaining of the objection to the testimony of Nichol as to the Sawyer estate would not cause any different result in the determination of this cause, because findings to be made as to Sawyer and the Sawyer estate in the decree to be entered herein are amply sustained by evidence other than that of Nichol. As to the objection of Stice to the testimony of Nichol, we do not regard this objection as well taken. Stice was not defendant as an administrator, executor, etc., and section 2 of the Evidence Act did not apply to him. Section 2 does not bar testimony of an interested party as to the assignee or transferee of the decedent.

Stice raises the point that the evidence taken herein does not sustain the finding that he was not a bona fide holder of 370 shares of stock purchased by him. We have reviewed the evidence on this question and feel that the chancellor was correct in holding that Stice was not a bona fide holder of the 370 shares. It is not necessary to recite the evidence on this question, but we are satisfied from the small amount of the money paid by Stice for this stock, in connection with the other evidence and circumstances proved at the

time of the trial, that Stice did not in good faith purchase the said 370 shares of stock nor did he intend to divest Sawyer of all interest therein. We concur in the chancellor's finding in this regard and have above directed that Stice be repaid the amount of money he paid on account of the purchase of the said 370 shares.

The company contends in its cross-errors that the trial court erred in finding that the causes of action for the recovery of the bribes which Martin paid to his fellow directors were not assigned on November 19, 1929 by the association to the company. We are of the opinion that any cause of action which is established in favor of the association is established by operation of law for the benefit of the policyholders of the association. It may be technically treated as the property of the association but it is equitably the property of the policyholders. Martin and his fellow directors could not legally assign that cause of action which equitably belonged to the policyholders unless the policyholders were informed of the fact that they had such a cause of action before the assignment was made. Such action would permit the directors to waive their own wrong and cancel any liability which they might have to their beneficiaries. We cannot approve such a situation as it would result in defrauding the innocent victims of the directors' breach of trust and then holding that they had no remedy because the guilty directors had themselves disposed of the policyholders' rights to an accounting. We are therefore of the opinion that the chancellor was correct in holding that the rights of the association for breach of trust against the guilty directors were not assigned to the company.

The company further urges that Martin had received certain other moneys and assets of the company which he was not rightfully entitled to, on certain loans made from the company at the instance of Martin. Proofs on this question should be taken on a

rehearing of this case and the decree entered herein amended as may be in accordance with such proofs and in conformity with the principles announced herein. The decree appealed from awarded $160,000 against the Woods estate. Inasmuch as no appeal was taken herein by the Woods estate, the decree against said estate became final.

For the reasons hereinabove expressed the decree entered herein is affirmed except as to the adjustments above set forth, and this cause is remanded to the circuit court with directions to proceed herein according to the views herein expressed.

*Affirmed in part, and remanded with directions.*

BURKE, P. J., and KILEY, J., concur.