Victor Pelcak et al., Czechoslovak Society of America, Appellees, v. Jerry Bartos et al., Vaclav Cipra and Maurice B. Vick et al., Trading as M. B. Vick and Company, Appellants.

Gen. No. 43,440.

436

Opinion filed April 11, 1946.  Released for publication May 16, 1946.

G. A. BURESH and JULIUS H. SELINGER, both of Chicago, for appellants.

LLOYD M. BROWN and JOHN M. BYRNE, both of Chicago, for appellee; BENJAMIN WEINBERG, of Chicago, of counsel.

MR. PRESIDING JUSTICE FRIEND delivered the opinion of the court.

In this proceeding an individual member and an incorporated fraternal insurance society charged that a conspiracy existed between 18 members constituting an executive committee, and various bondhouses, whereby the purchase and sale of securities by the society resulted in private gains to the defendants. In the course of the proceedings all the defendants were dismissed except Vaclav Cipra, one of the directors, and M. B. Vick & Co., one of the bondhouses. The case was then referred to a master in chancery, who later was appointed special commissioner, for the purpose of ascertaining whether or not an accounting should be had. The special commissioner filed his report, finding that the individual plaintiff and the society are not entitled to an accounting, and he recommended the dismissal of the complaint. Objections to the commissioner's report were overruled and permitted to stand as exceptions, and after the matter had been heard by the chancellor he sustained the exceptions to the report and entered a decree in favor of plaintiffs, from which defendants appeal.

The facts essential to a consideration of the issues involved disclose that the Czechoslovak Society of America (hereinafter referred to as the society) is a fraternal benefit society organized under the laws of the State of Illinois by merger of five separate organizations. It is a nonprofit organization, maintained primarily for the mutual benefit and protection of its members and their beneficiaries and provides benefits in case of death, misfortune or disability from disease, accident or old age. The governing bodies of the so-

ciety are the convention, the executive committee, grand lodges, lodges and committees. The convention is the highest legislative and governing body consisting of delegates elected from the membership who meet every four years with authority to amend the constitution and the charter, maintain order and discipline and promote justice among its members. The executive committee, consisting of 18 officers elected by the convention, is the chief administrative body when the convention is not in session and is accountable to the convention for the faithful execution of the resolutions of the convention, is charged with the duty of investing the funds of the society, and is required to hold monthly meetings and receive reports of the officers and committees. The board of trustees is the custodian of the securities of the society. Its duty is to submit to the executive committee at each meeting the total par value of all securities held on the date of the preceding meeting and a report of all securities redeemed, sold and acquired since the date of the last meeting, and to recommend to the executive committee a list of securities which it advises for purchase or sale.

During 1933 and 1934 Cipra was the dominant figure on the board of trustees. He was an experienced bond broker and was regarded with trust and confidence as an expert by the other members of the board who had no particular knowledge of securities and relied upon his recommendations and selections. During that time the board and not the executive committee actually made the investments and after they were consummated the approval of the executive committee was secured. Cipra handled the transactions for the board and actually did the investing of the society's funds, thereby assuming and performing the duties of a trustee in furtherance of the confidential relationship that existed. During the foregoing period Cipra received about $14,000, being a division of over

$28,000 profits made by Vick & Co. in certain bond transactions which Cipra handled for the society through that company, and about $1,300 on bonds sold to the society, as well as additional commissions in considerable amounts from several other bondhouses. Although Cipra was known to be a bond dealer he nevertheless did not actually disclose to and inform the society that he was receiving profits and commissions and dividing profits in the purchase and sale of securities on behalf of the society, and he did not at any time disclose to the society the actual amount of such commissions and profits which he received and retained. It appears from the evidence that at an executive committee meeting on July 5, 1935 and at the 1938 convention of the society, upon direct inquiry he refused to answer whether he had received such commissions and profits and stated that he would consult an attorney. These circumstances indicate that the society did not theretofore know that he intended to make or receive such commissions or profits before the respective transactions occurred. It was not until July 1934 that rumors and suspicions arose as to his transactions but no actual facts or proof was then divulged. Subsequently W. J. Muzik, who was secretary of the society during 1933 and 1934 and who had consistently complained about the purchase and sale of bonds through Cipra, moved that all purchases made during 1933 and 1934 be investigated. Muzik then wrote to the Insurance Department of Illinois and requested an investigation. The department later sent to each member of the executive committee a letter stating that in its opinion the society had paid excessive prices for some of the bonds. The matter was then again investigated by the society for several months and ultimately a complaint was lodged with the state's attorney of Cook county, and it was not until a few days before the opening of the quadrennial convention in August 1938, when the report of the

state's attorney of Cook county, Illinois, was obtained by W. J. Muzik, that partial proof was actually obtained.

Cipra contends that no complaint was ever made in the executive committee about the fact that he was receiving commissions on the purchase of bonds by the society; that he always admitted that he was getting something; that he was entitled to a commission or concession; that the society suffered no loss by reason of any bond purchases made during the two years in question; that it made a considerable profit on them; and that the sales were made pursuant to previously secured bids. However, under the established rule of law in this State a trustee and officer in Cipra's position, investing the society's funds, cannot lawfully make and retain secret commissions and profits in his dealings with the society's funds. *Dixmoor Golf Club, Inc. v. Evans,* 325 Ill. 612; *Farwell v. Pyle-National Elec. Headlight Co.,* 289 Ill. 157; *Winger v. Chicago City Bank & Trust Co.,* 325 Ill. App. 459; and *Goldberg v. Ball,* 305 Ill. App. 273. The record does not support Cipra's contention that the society did not pay more for the securities than it would have had to pay if the commissions had not been given to him and profits had not been made; it appears reasonably clear that the society overpaid for the securities an aggregate of approximately $20,000 in 1933 and again in 1934 or a total of more than $40,000. A few instances of the overpayments made will suffice to support this conclusion. It appears that on November 25, 1933 Vick & Co. sold to the society City of Hoquiam, Washington, Water Works Bonds, par value $20,000, at 98, for which the society paid Vick & Co. $19,853.15. These same bonds were purchased by Vick & Co. on November 20, 1933 at 80. Out of the profits of this transaction Vick & Co. paid Cipra $1,900. In December 1933 Vick & Co. sold the society for $9,980.29 two blocks of $5,000 par

value City of Hoquiam Water Bonds at 98, or an aggregate of $10,000 par value of bonds, which were purchased by Vick & Co. at 81, and out of the profits of this transaction Vick & Co. paid Cipra the sum of $1,150. It further appears that from July 12, 1933 to December 29, 1933 Vick & Co. secretly issued to Cipra 10 checks aggregating $6,745, representing his secret share of the profit from said transactions, and that from January 30, 1934 to December 29, 1934 Vick & Co. issued to Cipra 25 checks aggregating $7,254.43 as his secret share of the profits from said transactions during that period. The record discloses that when Vick & Co. received orders from Cipra for these bonds it had knowledge that he was chairman of the board of trustees of the society, and participated with him in these transactions.

But even if it be assumed, as Cipra contends, that there was no increase in cost, that the society did not overpay for these securities and that it suffered no loss or injury, nevertheless, by reason of his fiduciary relationship and trust, he would still be accountable to the society for any secret personal profit made by him. In *Dixmoor Golf Club, Inc. v. Evans*, 325 Ill. 612, the court made the following pertinent observations with respect to a similar situation: "The law is well settled that a trustee cannot without a breach of the trust deal with its subject matter in such a manner as to make a profit for his own benefit. It requires no very keen moral perception to recognize the obvious justice of this universal rule of law, of justice and of morality. The directors of a corporation are trustees of its business and property for the collective body of stockholders in respect to such business. They are subject to the general rule in regard to trusts and trustees, that they cannot, in their dealings with the business or property of the trust, use their relation to it for their own personal gain. It is their duty to administer the corporate affairs for the

common benefit of all the stockholders and exercise their best care, skill and judgment in the management of the corporate business solely in the interest of the corporation. (*Farwell v. Pyle-National Elec. Headlight Co.*, 289 Ill. 157.) The stockholders are entitled to the utmost fidelity of the directors to the interest of the stockholders. It is a breach of duty for the directors to place themselves in a position where their personal interests would prevent them from acting for the best interests of those they represent." The same rule of law is expressed in *Farwell v. Pyle-National Elec. Headlight Co.*, 289 Ill. 157; *Winger v. Chicago City Bank & Trust Co.*, 325 Ill. App. 459; *Goldberg v. Ball*, 305 Ill. App. 273; and *Continental Securities Co. v. Belmont*, 206 N. Y. 7, 99 N. E. 138.

Cipra also relies on the fact that he was a licensed bond dealer and therefore entitled to make and keep the commissions on the society's bond transactions because it was the policy of the society to benefit and assist its own members wherever possible. It is a sufficient answer to this contention that under the law Cipra cannot keep commissions thus earned under the facts of this case. In the leading case of *White v. Sherman*, 168 Ill. 589, the court stated the reason for the rule as follows: "The law does not allow a trustee to retain any personal gain, which he may obtain in such a manner as subjects him to the temptation of placing himself in a position which may be hostile to the interests of the estate, whether the estate is actually injured or not as a matter of fact. The fact, that he was receiving commissions, might have subjected him to a temptation to place a larger line of insurance than was necessary on the trust property. It is not essential, that the estate has suffered a loss from what he has done; it is sufficient that he has gained a profit. Whether the contract was beneficial or injurious to the estate is wholly immaterial. An agent is only entitled to commissions upon a faithful

performance of all the duties of his agency. One of these duties is to render to his principal statements of all money received and profits made through his agency. (*Fish v. Seeberger,* 154 Ill. 30; *Hoyt v. Shipherd,* 70 id. 309; 27 Am. & Eng. Ency. of Law, 187, 194, 196; Perry on Trusts, sec. 209; *Gillette v. Peppercorne,* 3 Beav. 78; 2 Pomeroy's Eq. Jur., sec. 1075)." In *Metcalf v. Metcalf,* 286 Ill. App. 10, an officer of a bank and the bank handled securities for an elderly woman, advised her as to investments and sold and purchased securities for her, making certain commissions on the transaction. A judgment in excess of $5,000 against both the officer and the bank was affirmed and the court again enunciated the principle laid down in *White v. Sherman* and cited additional cases in support of its conclusion.

One of the principal contentions urged by defendants is that the resolution of the executive committee, after full investigation, and the resolution of the convention, the highest legislative and governing body of the society, after a full hearing, definitely closed the matter of Cipra's transactions for all time, and that these resolutions were binding on the society and its members. It should be borne in mind however that the society in this proceeding is a fraternal benefit insurance corporation, different from a business corporation or other classes of insurance companies. It is organized not for profit pursuant to the Insurance Code of Illinois, is subject to examination, supervision and control of the Department of Insurance, is affected with a public interest, and unlike other corporations, the members of the society are the beneficial owners of its property and its assets. *Knights Templars & Masons Life Indemnity Co. v. Vail,* 206 Ill. 404; *State v. The Praetorians* (Tex.), 186 S. W. (2d) 973; and *Winger v. Chicago City Bank & Trust Co.,* 325 Ill. App. 459. We find no cases in defendants' brief involving a fraternal benefit organization sup-

porting their contention. Moreover the constitution and by-laws of the society contain no statement whatsoever that the decision of the convention shall be final and conclusive and no such restriction is made as to the funds of the society. The provision that the "Convention shall be the highest legislative and governing body of the Society" does not expressly give such authority; and to regard the decision of the convention as final and conclusive would deprive the society of its inherent right to recover a large sum of money wrongfully paid to one of its members.

In connection with the foregoing contention it is also urged that the resolution of the convention in 1938 that the matter "be definitely closed for all time" constituted a ratification. The facts disclosed by the record do not support this rather naive assertion. It appears from the evidence that the resolution directed that in the best interest of the society Cipra be asked to resign, it found that the executive committee, with the exception of a few members, did not perform its duties to the best interest of the society, and it recommended that the convention take this into consideration when electing a new executive committee. An extended debate preceded the resolution of the convention, but it does not appear that there was a single word of approval of Cipra's commissions or of his division of profits with Vick & Co. realized from overpayment on the bonds; on the contrary Cipra's conduct in this respect was generally and bitterly condemned and the substance of the debate showed that the resolution was finally adopted to minimize any possible scandal and preserve harmony within the society. The resolution adopted was in fact a censure and condemnation of Cipra's conduct and the fact that he was asked to resign would clearly indicate that his conduct was not ratified or condoned.

Moreover, since the taking of secret profits by Cipra and Vick & Co. was illegal, neither the executive committee nor the convention had the power to ratify

their acts and practices. In *Loft, Inc. v. Guth,* 23 Del. Ch. 138, 2 Atl. (2d) 225, it was held that the investment of corporate funds by the company's president for his personal gain was fraudulent and could not be ratified by the directors, and in *Continental Securities Co. v. Belmont,* 206 N. Y. 7, 99 N. E. 138, where directors had made a large personal profit through issuance of stock in a reorganization ratified by the stockholders, the transaction was held fraudulent and void and incapable of ratification.

In all the bond transactions which Cipra conducted with and through Vick & Co., the fact that he was a trustee of and for the society was well known to the bondhouse and it also knew that he was acting for and on behalf of the society in the purchase and sale of securities which were sold and delivered to the society. Under the established rule in this State a third person who knowingly participates with a fiduciary in violation of his fiduciary duties is chargeable for secret profits made or shared by it from such violations. Consequently Vick & Co. is chargeable for the amount of those secret profits. *Kinney v. Lindgren,* 373 Ill. 415; *People v. Small,* 319 Ill. 437; *Metcalf v. Metcalf,* 286 Ill. App. 10; Scott on Trusts, vol. 3, sec. 506, p. 2429.

The contention of the defendants that the decree does not fix the rights of the parties or declare the rule to be adopted in stating the account and that it erroneously requires Cipra and Vick & Co. to account for all profits in the transactions, is untenable, since the decree provides that defendants shall account for the secret and illegal profits made by Cipra alone and also those made by him and Vick & Co. as participants in the purchase for and sale to the society of securities during 1933 and 1934, and orders the account to be stated upon the pleadings and all the testimony and exhibits in the report of the master and special commissioner, and such further evidence as may be presented by the parties. It goes without

saying that defendants are not held accountable for any legitimate earnings but only for their wrongful gains.

■ Additional defenses interposed are the Statute of Limitations and laches. The record discloses that the individual plaintiffs, the society and the members thereof did not know the actual and complete facts until August 1938, when the state's attorney's report was presented to the convention. Prior to that time there was only suspicion and rumor as to defendants' conduct. Until the convention met in 1938 defendants refused to divulge any information. Fraudulent concealment stops the running of the Statute of Limitations until the cause of action is discovered. *Winger v. Chicago City Bank & Trust Co.*, 325 Ill. App. 459. In *Auer v. William Meyer Co.*, 322 Ill. App. 244, we held that where a cause of action arises from fraud the Statute of Limitations will not begin to run nor laches apply until the discovery of the fraud or from the time when the fraud could have been discovered by the exercise of reasonable diligence.

■ The decree in this case specifically finds that Cipra was a trustee of the society and while acting in such capacity made and retained for himself large secret and illegal profits through the purchase, sale and exchange of securities for and to the society and orders that he should account to the society for such secret profits. The record abundantly sustains these findings. The decree further finds that Vick & Co. had knowledge that Cipra was a trustee of the society, participated with him in the purchase, sale and exchange of securities for the society, from which it made large profits which it secretly divided with him, and the record sustains these findings. In view of these conclusions we are satisfied that the decree was in all respects correct and proper, and it is therefore affirmed.

*Decree affirmed.*

SCANLAN and SULLIVAN, JJ., concur.